FILED
2015 Jan-06  PM 03:06
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## NORTHWESTERN DIVISION

| | | |
|---|---|---|
| **DEXTROSE L. MCDANIEL,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Civil Action No. CV-13-S-1705-NW** |
| | ) | |
| **WISE ALLOYS, LLC,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff, Dextrose L. McDaniel, who is an African-American, asserts claims for race-based discrimination in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e *et seq.*, and 42 U.S.C. § 1981, against his former employer, Wise Alloys, LLC, based upon his termination.[1]  The case presently is before the court on Wise Alloy's motion for summary judgment.[2] Upon consideration of the pleadings, briefs, and evidentiary submissions, this court concludes that the motion should be denied.

## I.  SUMMARY JUDGMENT STANDARDS

Federal Rule of Civil Procedure 56 provides that a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact

---

[1] Doc. no. 1 (Complaint).

[2] Doc. no. 12.

and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In other words, summary judgment is proper "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "In making this determination, the court must review all evidence and make all reasonable inferences in favor of the party opposing summary judgment." *Chapman v. AI Transport*, 229 F.3d 1012, 1023 (11th Cir. 2000) (*en banc*) (quoting *Haves v. City of Miami*, 52 F.3d 918, 921 (11th Cir. 1995)). Inferences in favor of the non-moving party are not unqualified, however. "[A]n inference is not reasonable if it is only a guess or a possibility, for such an inference is not based on the evidence, but is pure conjecture and speculation." *Daniels v. Twin Oaks Nursing Home*, 692 F.2d 1321, 1324 (11th Cir. 1983) (alteration supplied). Moreover,

> [t]he mere existence of some factual dispute will not defeat summary judgment unless that factual dispute is *material* to an issue affecting the outcome of the case. The relevant rules of substantive law dictate the materiality of a disputed fact. A genuine issue of material fact does not exist unless there is sufficient evidence favoring the nonmoving party for a reasonable jury to return a verdict in its favor.

*Chapman*, 229 F.3d at 1023 (quoting *Haves*, 52 F.3d at 921) (emphasis and alteration supplied). *See also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986)

2

(asking "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law").

## II. SUMMARY OF FACTS

### A.    Plaintiff's Employment

Wise Alloys operates an aluminum and alloy processing and manufacturing facility in Muscle Shoals, Alabama.[3]  From 2007 to April 2011, the company retained an independent contractor to perform maintenance work in its Muscle Shoals facility.[4] The contractor hired plaintiff in 2007, and assigned him to work as a maintenance technician in "the Cast House."[5]  In that capacity, plaintiff performed troubleshooting, repaired equipment, changed molds and blocks, replaced thermocouples, and

---

[3] Doc. no. 13 (Evidentiary Submission in Support of Summary Judgment), at ECF 96, ¶ 1. "ECF" is the acronym for "Electronic Case Filing," a system that allows parties to file and serve documents electronically.  *See Atterbury v. Foulk*, No. C-07-6256 MHP, 2009 WL 4723547, *6 n.6 (N.D. Cal. Dec. 8, 2009).  Bluebook Rule 7.1.4 permits citations to the "page numbers generated by the ECF header."  *Wilson v. Fullwood*, 772 F. Supp. 2d 246, 257 n.5 (D.D.C. 2011) (citing *The Bluebook: A Uniform System of Citation* R. B. 7.1.4, at 21 (Columbia Law Review Ass'n *et al.*, 19th ed. 2010)).  Even so, *The Bluebook* recommends "against citation to ECF pagination in lieu of original pagination."  *Wilson*, 772 F. Supp. 2d at 257 n.5.  Thus, unless stated otherwise, this court will cite the original pagination in the parties' pleadings.  When the court cites to pagination generated by the ECF header, it will, as here, precede the page number with the letters "ECF."

[4] *Id.* ¶ 2.

[5] *Id.* at ECF 18.  The Cast House is where molten aluminum is converted into ingots (*i.e.*, large slabs).  Those ingots are then put through multiple hot or cold rolling processes in one of the rolling mill departments at Wise Alloys' Muscle Shoals facility and converted to sheets for shipment to end users.  *See id.*

performed other key duties on an as needed basis.[6]

In April 2011, Wise Alloys' contract with the independent firm ended, and it brought the maintenance work back in-house.[7]  Shortly thereafter, Randy Frey, a Caucasian, became maintenance manager of the Cast House, and was responsible for overseeing all of its maintenance operations.[8]  Bryan Tardo, a Caucasian, reported directly to Frey, and plaintiff reported to both men at the time he was terminated.[9] Plaintiff never witnessed either supervisor make racial comments or utter any racial slurs.[10]

## B.    Plaintiff's Performance Issues

Although plaintiff testified that he "got along with everybody," including his supervisors,[11] his co-workers complained to Frey in late 2011 that plaintiff was not communicating with them, that he was taking breaks while they worked, and that he was leaving jobs and disappearing.[12]   In early 2012, Jack Darby, Production Supervisor, complained to Frey that plaintiff was interfering with production

---

[6] Doc. no. 13 (Evidentiary Submission in Support of Summary Judgment), at ECF 72.

[7] *Id.* at ECF 96, ¶ 3.

[8] *Id.* at ECF 71.

[9] *Id.* at ECF 21, 72.

[10] *Id.* at ECF 22.

[11] Doc. no. 13 (Evidentiary Submission in Support of Summary Judgment), at ECF 22.

[12] *Id.* at ECF 88.

employees, and standing around watching the other maintenance technicians work.[13]

Frey disciplined plaintiff on November 7, 2012, because, in the prior year, plaintiff had called in sick, left early, or been late seven times on Friday or Saturdays.[14]   In the "Record of Incident/Discussion" form, Frey indicated that plaintiff's pattern of absenteeism, tardiness, and leaving early would not be tolerated.[15]  Plaintiff was advised that, "if your attendance record is not improved you will be subject to further Disciplinary action, up to and including Discharge."[16] Thus, plaintiff was placed on notice that there would be negative consequences if he continued to have attendance problems.[17]

Plaintiff, Danny Parker, and Arnold Brewer received counseling on October 10, 2012, after supervisors became aware of disagreements among the three co-workers.[18]   Tardo noted the following in a "Record of Incident/Discussion" form:

> On the evening of Wednesday 10/10/12 Gary Touchette and I had a conversation with [Danny Parker, Arnold Brewer, and plaintiff]. There had been some disagreements during the shift amongst [*sic*] the team members.  The discussion was based around the need for team work.  We explained to them that the shift lead has the authority to prioritize and delegate work as needed to facilitate needs of production.

---

[13] *Id.* at ECF 73.

[14] *Id.* at ECF 54.

[15] *Id.*

[16] *Id.*

[17] Doc. no. 13 (Evidentiary Submission in Support of Summary Judgment), at ECF 25.

[18] *Id.* at 53.

Another point of the discussion was quality of work.  We explained to them that we don't have the time or resources to execute a task twice because the quality of craftsmanship was subpar the first time.  It was noted that such behavior would not be tolerated at Wise Alloys.  The final topic of discussion was emotion.  We told the team members that as grown men they should be able to have disagreements without their emotions or tempers coming into play.

Doc. no. 13 (Evidentiary Submission in Support of Summary Judgment), at ECF 53 (alterations supplied).  Plaintiff contends that the argument was between Brewer and Parker, and that he was not involved, but he was required to attend the counseling session because he was on the same team shift.[19]

On November 15, 2012, Tardo received a complaint that plaintiff was not participating in his work duties, and was sleeping in a locker room.[20]  Tardo found plaintiff in the locker room, where he told Tardo that he was having blinding migraines, had informed one of his co-workers that he was heading to the locker room to sit down for a few minutes, and had only been there for thirty minutes before Tardo came in.[21]  Tardo instructed plaintiff that, "if he was unable to help with the work, the least he could do was notify his lead about the condition."[22]  This was not the first time Tardo counseled plaintiff about taking breaks.[23]  According to Frey, plaintiff

---

[19] *Id.* at ECF 23.

[20] *Id.* at ECF 25.

[21] *Id.*

[22] *Id.* at ECF 59.

[23] *Id.* at ECF 29.

would "become more of a team player" after counseling, but he "would regress from time to time."[24]

Plaintiff was scheduled to work the night of December 24, 2012.[25]  It was critical that maintenance technicians show up for their scheduled shifts around the holidays because shifts were minimally staffed and a technician's absence would create serious problems for the remainder of the maintenance staff.[26]  On December 23, 2012, plaintiff sent text messages to Frey and Tardo stating:  "I want to take off chris eve nite Arnold [Brewer] is covern 4 me if thats ok."[27]  Tardo responded:  "As long as arnold covers."[28]  At the time, it was permitted by management for an employee to ask another technician to fill in for a shift, as long as the other technician agreed to cover the shift.[29]  However, neither plaintiff nor Arnold Brewer showed up on December 24, 2012.[30]

Plaintiff was not scheduled to work, or he took vacation days off, between the

---

[24] *Id.* at ECF 73.

[25] *Id.* at ECF 29.

[26] Doc. no. 13 (Evidentiary Submission in Support of Summary Judgment), at ECF 46.

[27] *Id.* at ECF 30, 60-61 (alteration added).  Plaintiff first sent the text message to Frey, who told him to talk to Tardo.  *Id.* at ECF 63.

[28] *Id.* at ECF 64.

[29] *Id.* at ECF 75.

[30] *Id.* at ECF 32.

25th and the 30th of December, 2012.[31]  He was originally not scheduled to work on the 31st as well, but the company decided that all Cast House maintenance technicians would be required to work that day so they could complete certain necessary maintenance while the rest of the employees were out ("the outage").[32]  A few weeks prior to the outage, Frey attempted to notify the maintenance technicians about the mandatory work-day by making an announcement during morning safety meetings, and by writing a note on a big white board in the technician shop.[33]  Despite Frey's efforts, plaintiff contends that he was never notified that he had to come in on December 31, 2012.[34]

On December 29, 2012, Tardo sent plaintiff a text telling him the company required him to work on December 31, 2012.[35]  Plaintiff did not receive the text message, however, because his phone was not working at the time.[36]  Plaintiff did not show up to work on December 31, 2012.[37]

---

[31] Doc. no. 13 (Evidentiary Submission in Support of Summary Judgment), at ECF 34.

[32] *Id.* at ECF 83.

[33] *Id.*

[34] *Id.* at ECF 35.  Although plaintiff admits that he heard some of his co-workers talking about the outage, he did not know that it was mandatory for him to attend because all previous outages were voluntary. *Id.* at 35-36.

[35] *Id.* at ECF 66.

[36] *Id.* at ECF 76.

[37] *Id.* at ECF 84.

Plaintiff was scheduled to report for work at 7:00 a.m. on January 1, 2013.[38] At around 11:00 p.m. the night before, plaintiff's wife sent Tardo a text message saying that he was going to be late to work the next day.[39]  Plaintiff called Tardo the following morning and told him that he would probably be even later because he had to take care of his disabled brother.[40]  Plaintiff arrived at work around Noon — five hours into his shift.[41]

## C.    Plaintiff's Termination

Frey was on vacation during the Christmas and New Years holidays.[42]  Upon his return, Tardo sent him the following email on Friday, January 4, 2013, at 2:46 p.m.:

> 12/23: [plaintiff] text me asking if it was ok to take xmas eve off if he had someone to cover.  I told him as long as he had coverage for his shift he could take off.  Apparently he had not arranged for coverage and took off anyways.
>
> I notified all the techs approximately two weeks prior to the New Years House Outage to plan on working 12/31 and 1/1 even though the days were holidays.  I told them we needed participation from everyone to complete the planned tasks, and that specific times and assignments would follow.  On 12/27 I wrote on the message board in the tech shop what times I wanted what shifts to work.  [Plaintiff] was on vacation and

[38] Doc. no. 13 (Evidentiary Submission in Support of Summary Judgment), at ECF 37.

[39] *Id.*

[40] *Id.* at ECF 37-38.

[41] *Id.* at ECF 37.

[42] Doc. no. 13 (Evidentiary Submission in Support of Summary Judgment), at ECF 75-76.

obviously unable to read the board, so on 12/29 I sent him a text telling him that I needed him to work monday 12/31 7a_7p. [Plaintiff] never showed up to work and didn't bother to call and notify me that he was unable to come.

1/1 was [plaintiff's] normaly [*sic*] scheduled work day.   At approximately 11pm on 12/31 [plaintiff] sent me a message stating that he had just gotten back into town and would be late tuesday 1/1for that reason.  He didn't show up to work until lunch on 1/1.

[Plaintiff] was the only non excused tech to not work the outage. We had one tech that was sick and another who was excused from the outage due to nonrefundable reservations.  Everyone else modified their personal holiday schedules to help with the outage work.

Doc. no. 13 (Evidentiary Submission in Support of Summary Judgment), at ECF 66 (alterations supplied).

The following Monday, January 7, 2013, Frey met with plaintiff to discuss his recent absences and tardiness.  Plaintiff contends that Frey said he was going to give plaintiff "some days off."[43]  In addition, Frey discussed plaintiff's failure to show up for work on December 24, 2012, or to arrange for coverage on that shift.[44]  Plaintiff contends that he did not know about Arnold Brewer's failure to cover his shift until Frey discussed it with him.[45]  Based on that meeting, Frey completed a "Record of Incident/Discussion" form, stating:

---

[43] *Id.* at ECF 41.

[44] *Id.*

[45] *Id.* at ECF 31-32.

> Discussed with [plaintiff] why he was a no show on new years eve and was late on new years day.  He said he didn't show because he was on vacation from the week before.  I asked why he didn't respond to [Tardo's] text message on Saturday 12/29 and he said his phone was broke.  But he texted [Tardo] Monday night to let him know he was going to be late on 1/1. [Plaintiff] didn't show up until 1230pm.  I discussed with [plaintiff] that he was the only tech that didn't show up for the outage.  Also discussed that this kind of action gives the shop bad morale and him a bad reputation.  This kind fo behavior is unacceptable.  I also discussed past incidents with [plaitniff] such as calling in sick and being late on Fridays and Saturdays.

*Id.* at ECF 65 (alterations added).  Frey also stated that he did not believe plaintiff's phone was not working when Tardo attempted to contact him.[46]

After meeting with plaintiff, Frey met with John Blazer in Human Resources, and recommended terminating plaintiff's employment.[47]  Thereafter, Blazer provided the information to Freddie Copeland, Vice President of Labor Relations, who made the decision to terminate plaintiff's employment.[48]  That afternoon, Frey and Blazer met with plaintiff, and Blazer told plaintiff he was being terminated.[49]  Cuberto Mojica, who is Hispanic, replaced plaintiff.[50]

**D.   Other Employees' Performance Issues**

    **1.**   *Jonathan Borden*

---

[46] *Id.* at ECF 76.

[47] Doc. no. 13 (Evidentiary Submission in Support of Summary Judgment), at ECF 77-78.

[48] *Id.* at ECF 77.

[49] *Id.* at ECF 78.

[50] *Id.* at ECF 78-79.

Jonathan Borden, one of plaintiff's Caucasian co-workers, received three write-ups for attendance issues:  a written warning on July 7, 2011, for failing to show up for work or report off; a written warning on February 7, 2012, for two incidents of tardiness and one incident of leaving his shift early; and counseling on May 15, 2012, for failing to report to work or report off.[51]  The final write-up noted:  "It has been made clear to Jonathan that if in the future this happens again, disciplinary actions will be taken."[52]

Borden was suspended on May 18, 2012, and Tardo wrote the following note:

> On the afternoon of 5/18/12 I was contacted by the Pain Center of Lawrenceburg, Tn.  They wanted to know if I was Borden's supervisor.  After explaining to them that I was, they told me that they had called him in for a pill count on 5/9/12.  On the morning of 5/9/12 someone contacted them and stated that Borden couldn't make it in for the pill count because he was called into work.  The clinic wanted me to verify that he was at work on 5/9/12 because Borden had given them an excuse on company letterhead stating that he was.  They expressed concern that it was forged.

> HR contacted the Pain Center and obtained a copy of the letter that he sent to them.  The letter was signed by a "Roger Davis".  After reviewing the circumstances with myself and Randy Frey, HR called Borden in for a meeting.  We presented Borden with the letter and he told us that he had given it to his lawyer.  Charlie Wright told him that we obtained it from the clinic.  After this, Borden explained to us that he had accidentaly [sic] given it to the clinic in a mix up.  We asked him about the date in question and supplied him with time clock records

---

[51] Doc. no. 13 (Evidentiary Submission in Support of Summary Judgment), at ECF 110-112.

[52] *Id.* at ECF 110.

proving that he wasn't at work on 5/9/12.  He said that he had mistakenly put the wrong date on the paper and it should have been for the week prior.  He admitted to forging the document, and claimed it was because supervision had gone home for the day and he needed it the next morning.  It was explained to Borden that forging a company document is a serious offense punishable by termination.  Charlie Wright informed Borden that he was suspended until further notice.

Doc. no. 13 (Evidentiary Submission in Support of Summary Judgment), at ECF 109.

Thereafter, Borden was terminated for falsification of company documents.[53]

### 2.    *Arnold Brewer*

As previously mentioned, Arnold Brewer, a Caucasian, received counseling on October 12, 2012, after supervisors became aware of a disagreement between him and Danny Parker.[54]  Additionally, Brewer was not disciplined for failing to show up on December 24, 2012, after plaintiff purportedly asked Brewer to fill-in for him.[55]  Frey testified that he spoke with Brewer on the Friday before plaintiff's termination:

I talked with Arnold Brewer about [not working plaintiff's shift on December 24, 2012], and he had told me that he did not agree to work that shift.  And looking at the — his dates when he was supposed to work it makes sense because Arnold was scheduled to work Christmas day . . . at 7:00 a.m., and [plaintiff] asked him to work Christmas Eve at 7:00 p.m., so he was asking him to work 7:00 p.m. to 7:00 a.m. Christmas Eve.  And so Christmas day Arnold was supposed to work 7:00 a.m. to 7:00 p.m. but took a vacation day that day.  So it don't make any sense that Arnold would have even . . . accepted that .

---

[53] *Id.* at ECF 79.

[54] *Id.* at 53.

[55] Doc. no. 13  (Evidentiary Submission in Support of Summary Judgment), at ECF 78.

. . shift or agreed to it.

Doc. no. 13 (Evidentiary Submission in Support of Summary Judgment), at ECF 78 (alterations added). Plaintiff contends that, when he talked to Frey on Monday, January 7, 2013, Frey told him he had not yet talked to Brewer about covering for plaintiff's shift.[56]

On January 21, 2013, Brewer received counseling based upon another argument he had with a co-worker. Tardo noted the following in a "Record of Incident/Discussion" form:

> On the morning of 1/21/13 Jeff McKinney was involved in an incident with co-worker Arnold Brewer. The two were discussing an issue with one of the overhead cranes in the casthouse when Arnold began to get upset. Arnold was under the impression that Jeff had been talking bad behind his back about his abilities, and believed that Jeff was making fun of him while they were discussing the issue with the crane. The discussion became "heated" and both parties came to my office where the arguing continued. After much discussion with Arnold, Jeff, Randy Frey, Kevin Simpson, and I[,] a consensus was reached by all parties about the issue. The root cause of the problem was communication. It has been stressed to both Jeff and Arnold that emotional outburst causing confrontational situations will not be tolerated. In this situation Arnold was the aggressor, and further conversation with him will be held. It should be noted that we have addressed with Jeff that if he is partaking in the "trash talking", it will be stopped immediately. Jeff is a tremendous asset to this company and is not normally caught up in incidents such as this.

Doc. no. 16 (Evidentiary Submission in Opposition to Summary Judgment), at ECF

---

[56] *Id.* at ECF 32.

11 (alteration supplied).

### 3. *Shane Wallace*

Shane Wallace, one of plaintiff's Caucasian co-workers, received three write-ups for attendance issues: counseling on October 10, 2011, for clocking in fifteen minutes early; counseling on June 27, 2012, for at least three incidents of tardiness and a "less than desirable" attitude; and disciplinary action on May 1, 2013, for six separate incidents of tardiness over the previous year.[57]  The final write-up noted that, "such behavior will not be tolerated," and "that future occurrences will be punished in accordance with the [Wise Alloys Attendance Policy]."[58]

### 4. *Gary Oliver*

Gary Oliver, one of plaintiff's Caucasian co-workers, received three write-ups for attendance issues: counseling on September 13, 2011, for three incidents of tardiness within the previous month; disciplinary action on October 10, 2011, for multiple incidents of clocking in early or forgetting to clock in; and counseling on March 11, 2013, for sleeping and using his cell phone for personal use in the electrical engineer's office.[59]  The final write-up noted that "Conduct such as this is unacceptable for any technician, but especially so for a lead technician," and added

---

[57] Doc. no. 13 (Evidentiary Submission in Support of Summary Judgment), at ECF 105-07.

[58] *Id.* at ECF 107.

[59] *Id.* at ECF 99-103.

that, "Any other occurrences of this nature will not be tolerated and will lead to further disciplinary action."[60]

## E.    Equal Employment Opportunity Commission Charge and Dismissal

Plaintiff filed a formal "Charge of Discrimination" with the Equal Employment Opportunity Commission on March 14, 2013.[61]  The agency issued a "Dismissal and Notice of Rights" on June 28, 2013, stating that it had terminated its investigation of his charge because it was unable to conclude that the information obtained established violations of the civil rights statutes.[62]  That document notified plaintiff of his right to file suit, and this action followed.

## III.  DISCUSION

Plaintiff's discriminatory termination claim is asserted under Title VII and 42 U.S.C. § 1981.[63]  "Both of these statutes have the same requirements of proof and use the same analytical framework . . . ."  *Standard v. A.B.E.L. Services, Inc.*, 161 F.3d 1318, 1330 (11th Cir. 1998).  The essential element under each statute is proof that the employer intentionally inflicted the adverse employment action complained of because of the plaintiff's race.  *See, e.g., Vessels v. Atlanta Independent School*

---

[60] *Id.* at ECF 103.

[61] Doc. no. 1-1 (Exhibits to Complaint), at ECF 1.

[62] *Id.* at ECF 2.

[63] Doc. no. 1 (Complaint), ¶ 1.

16

*System*, 408 F.3d 763, 767 (11th Cir. 2005) (observing that disparate treatment claims based upon a plaintiff's race and "brought under Title VII, § 1981, and § 1983, all require proof of discriminatory intent").

Plaintiff attempts to establish Wise Alloys' discriminatory intent through the use of circumstantial evidence.[64]  Federal courts evaluate the sufficiency of such evidence using some variant of the analytical framework announced by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), and elaborated in *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248 (1981).  *See also, e.g.*, *St. Mary's Honor Center v. Hicks*, 509 U.S. 502 (1993); *Chapman v. AI Transport*, 229 F.3d 1012, 1024 (11th Cir. 2004) (*en banc*);  *Berman v. Orkin Exterminating Co., Inc.*, 160 F.3d 697, 701 (11th Cir. 1998); *Bigge v. Albertsons, Inc.*, 894 F.2d 1497, 1501 (11th Cir. 1990).  Under that familiar framework, a plaintiff must first establish a *prima facie* case of disparate treatment, which creates a presumption of discrimination.  To rebut that presumption, the employer must articulate a legitimate, nondiscriminatory reason for the contested employment action. If the employer does so, the presumption of discrimination drops from the case, and the burden shifts back to the plaintiff to show that the employer's proffered reason is merely a pretext for unlawful discrimination. *See, e.g.*, *McDonnell Douglas*, 411 U.S.

---

[64] *See* doc. no. 15 (Response to Summary Judgment Motion), at 11.

at 802–05; *Burdine*, 450 U.S. at 252–56.

## A.      Prima Facie Case of Discrimination

The specific elements of a plaintiff's *prima facie* case generally vary with the nature of the adverse employment action that is complained of.  When, as here, the adverse employment action is disciplinary, a plaintiff usually must prove that:  he belongs to a protected class; he suffered an adverse employment action; he was qualified for the position he held; and his employer treated similarly situated employees outside his protected class more favorably (*i.e.*, the plaintiff must identify an "appropriate comparator").  *See, e.g.*, *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1325 (11th Cir. 2011); *McCann v. Tillman*, 526 F.3d 1370, 1373 (11th Cir. 2008); *Burke-Fowler v. Orange County, Florida*, 447 F.3d 1319, 1323 (11th Cir. 2006); *Knight v. Baptist Hospital of Miami, Inc.*, 330 F.3d 1313, 1316 (11th Cir. 2003); *Maniccia v. Brown*, 171 F.3d 1364, 1369 (11th Cir. 1999).  Alternatively, a plaintiff may identify an appropriate comparator by proving that he was replaced by a person outside his protected class.  *See Maynard v. Bd. of Regents of Div. of Univs. of Fla. Dep't of Educ.*, 342 F.3d 1281, 1289 (11th Cir. 2003).

Wise Alloys contends that plaintiff cannot prove that he was qualified for the position he held, or identify an appropriate comparator.[65]  The court disagrees.  In

---

[65] Doc. no. 14 (Brief in Support of Summary Judgment), at 13-14.

termination cases — as contrasted to cases involving an employer's failure to hire or promote — the question of whether a plaintiff was qualified to perform the duties of his job often is not an issue.  *See Crapp v. City of Miami Beach*, 242 F.3d 1017, 1020 (11th Cir. 2001).  The Eleventh Circuit has recognized that, "in cases where a plaintiff has held a position for a significant period of time, qualification for that position sufficient to satisfy the test of a prima facie case can be inferred." *Rosenfield v. Wellington Leisure Products, Inc.*, 827 F.2d 1493, 1495 n.2 (11th Cir. 1987); *see also Pace v. Southern Railway System*, 701 F.2d 1383, 1386 n.7 (11th Cir. 1983). Here, due to plaintiff's employment history with Wise Alloys, his qualification for his position can be inferred.[66]  Further, plaintiff, an African-American, was replaced by a Hispanic worker: that is, he was replaced by a person *outside* his protected class. Thus, he has identified an appropriate comparator.  Accordingly, plaintiff can establish a *prima facie* case of race discrimination in the termination of his

---

[66] In support of its argument that plaintiff was not qualified to do his job, Wise Alloys cites cases dealing with whether a plaintiff is a "qualified individual" under the Americans with Disabilities Act of 1990, 42 U.S.C. § 12111(8) ("ADA").  *See Davis v. Florida Power & Light Co.*, 205 F.3d 1301, 1306 (11th Cir. 2000). Those cases are not relevant in determining whether plaintiff was qualified for the position he held under the *McDonald Douglas* analytical framework in a racial discrimination case.  Even if they were, however, the ADA asks whether an individual "*can* perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8) (emphasis supplied).  In this case, plaintiff stated, "If I had known I had to be at work, I would have been there."  Doc. no. 13 (Evidentiary Submission in Support of Summary Judgment), at ECF 49.  Thus, plaintiff *could* perform the essential functions of his position (*i.e.*, regular attendance during critical shifts), and he would be a "qualified individual" under the ADA in any event.

employment.

## B.    Pretext

Wise Alloys contends that "the decision to terminate Plaintiff's employment was based on management's well supported good faith belief that he was not a team player, that he took advantage of the system for his own personal benefit[,] and that he had little regard for his job, his co-workers[,] or showing up to work."[67] Accordingly, Wise Alloys met its burden of coming forward with a legitimate, non-discriminatory reason for terminating plaintiff's employment.

In order to show that the employer's stated reasons are merely a pretext for a racial animus, a plaintiff "must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence." *Alvarez v. Royal Atlantic Developers, Inc.*, 610 F.3d 1253, 1265 (11th Cir. 2010) (internal quotation marks omitted); *see also, e.g.*, *Kragor v. Takeda Pharmaceuticals America, Inc.*, 702 F.3d 1304, 1308 (11th Cir. 2012); *Combs v. Plantation Patterns*, 106 F.3d 1519, 1538 (11th Cir. 1997); *Cooper-Houston v. Southern Railway Co.*, 37 F.3d 603, 605 (11th Cir. 1994).

Plaintiff attempts to discredit the proffered reason by pointing out that Wise

---

[67] Doc. no. 14 (Brief in Support of Summary Judgment), at 15 (alterations supplied).

Alloys failed to discharge the Caucasian employees who engaged in allegedly similar or worse behavior.[68]  *See Rioux v. City of Atlanta*, 520 F.3d 1269, 1279-80 (11th Cir. 2008) (plaintiff can show pretext by proving that similarly situated employees outside of his protected class, and who engaged in conduct "nearly identical" to his, were treated more favorably).  The court agrees.  Jonathan Borden, Shane Wallace, and Gary Oliver had attendance issues similar to plaintiff, yet they were never terminated for those issues.  Further, although those employees were threatened with disciplinary action, they were not threatened specifically with termination like plaintiff.  Additionally, some of plaintiff's Caucasian co-workers, including two with attendance issues, had behavioral issues similar to, or worse than, plaintiff's issues that led Frey to terminate him for "not being a team player."  For example, Arnold Brewer got into disruptive arguments at work with other maintenance technicians, Wallace was counseled about a "less than desirable attitude," and Oliver was caught sleeping and using his cell phone for personal use at work.

Plaintiff also contends that the investigation into his attendance issues was superficial.[69]  Indeed, taking the facts in the light most favorable to plaintiff, Frey's investigation was suspicious.  For example, Frey admitted to plaintiff that he hadn't

---

[68] Doc. no. 15 (Opposition to Summary Judgment), at 12-14.

[69] *Id.* at 16.

spoken to Brewer when they talked about plaintiff's attendance issues on January 7, 2013, but he later contended that he talked to Brewer *before* confronting plaintiff. Further, plaintiff was not even aware that Brewer didn't show up on Christmas Eve until Frey confronted him about it two weeks later.  Based upon these facts, one could conclude that Frey's investigation was superficial, and only initiated to build up a case for terminating plaintiff.

For these reasons, plaintiff can demonstrate that Wise Alloys' proffered reasons for his termination were pretextual.

## IV.  CONCLUSION

In accordance with the foregoing, it is ORDERED that Wise Alloys' motion for summary judgment is DENIED.  A pretrial conference and trial will be set by separate order.

DONE and ORDERED this 6th day of January, 2015.

United States District Judge

22